IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION No. 2:17-CV-226 (WOB-CJS)

NEIL DEGOLIA                                                    PLAINTIFF

VS.                    MEMORANDUM OPINION AND ORDER

KENTON COUNTY ET AL.                                      DEFENDANTS

This civil rights action was brought by Plaintiff Neil Degolia after he was arrested for public intoxication and taken to the Kenton County Detention Center, where Degolia alleges deputies threw him to the floor in the booking area and beat him, causing a black eye and injuries to his jaw, and then secured him in a restraint chair for just over two hours. Consistent with the surveillance video that captured these events, Degolia maintains he did not provoke the incident.

The Complaint contains the following six counts:

Count I:     Violation of the federal and state constitutional prohibition against the "use of excessive force" by virtue of the deputies' conduct in the booking area.

Count II:    Violation of the federal and state constitutional protection against the "use of excessive force" and "cruel and unusual punishment" as a result of the deputies' use of the restraint chair.

Count III:   State-law negligence.

Count IV:    Assault and battery under state law.

*Neil Degolia v. Kenton County* et al.

**Count V:**   Intentional and negligent infliction of emotional distress.

**Count VI:**   *Respondeat superior* as the basis for imposing liability on Kenton County, Kenton County Fiscal Court, and Kenton County Detention Center.

This matter is now before the Court on several motions that all boil down to cross-motions for summary judgment. Those motions are as follows: (1) Defendants' joint motion for summary judgment on all claims (Doc. 61); (2) Plaintiff's cross-motion for summary judgment on the issues of qualified immunity and the use of excessive force (Doc. 63); (3) Defendants' joint motion to strike plaintiff's motion for summary judgment (Doc. 64); (4) Plaintiff's motion for an extension of time to file a dispositive motion (the previously filed Doc. 63) or deny Defendants' motion to strike (Doc. 67); and (5) Plaintiff's motion for leave to file an affidavit as a surreply to the motion to strike (Doc. 74). The Court previously heard oral argument on the parties' motions and took the matter under submission. (Doc. 77).

For the reasons that follow, the Court will GRANT IN PART and DENY IN PART Plaintiff's motion for summary judgment, and GRANT IN PART and DENY IN PART Defendants' motion for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In this case, the material facts of the events in question were captured by several video recording devices. Thus, heeding the instruction of the Supreme Court and Sixth Circuit, the Court "view[s] the facts in the light depicted by the videotape[s]" as set forth below, *Scott v. Harris*, 550 U.S. 372, 381 (2007), and "any

relevant gaps or uncertainties left by the videos" are construed "in the light most favorable to the Plaintiff." *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017).

## A. Arrest

Beginning late in the evening on March 4, 2017, Degolia drank approximately four tall draft beers at a bar in Covington, Kentucky, the last of which was ingested around 2:00 AM on March 5. (Doc. 61-3, Degolia Dep. at 66). Degolia then walked to a nearby pizza restaurant. *Id.* at 61–66. According to Degolia, he was waiting in line when the staff ordered everyone out due to a disagreement that had erupted between an employee and a woman standing in front of Degolia. *Id.* at 63–65, 70–71.

Once outside the restaurant, Degolia was confronted by police officers at approximately 2:40 AM. (Doc. 1, ¶10); (Doc. 61-2). Body camera footage shows an officer approach Degolia on the sidewalk and ask him to leave. (Doc. 54, Ulrich Bodycam at 1:17–20). When Degolia questions the order, an officer instructs Degolia to "walk away" or be arrested. *Id.* at 1:20–26. Degolia initially agrees but then reengages in conversation with the officer and proposes that "if you walk, I'll walk." *Id.* at 1:27–38. The proposition is not appreciated, and the officer grabs Degolia to arrest him. *Id.* at 1:38–41. The image is obscured, but it is evident that Degolia is reluctant to put his hands behind his back. *Id.* at 1:41–2:06. Once in handcuffs, Degolia is compliant but visibly and audibly disgruntled. *Id.* at 2:15–3:34.

Degolia was cited for public intoxication. (Doc. 1, ¶ 10); (Doc. 61-2). The citation states that Degolia "was extremly [*sic*] intoxicated" and "unsteady on feet" and had

"slurred speech" and "bloodshot watery eyes." (Doc. 61-2).[1] At approximately 2:56 AM, Degolia was transported to Kenton County Detention Center ("KC Detention Center"). (Doc. 1, ¶ 10; Doc. 61–2).

## B.    Sally Port at the Detention Center

Video surveillance (without any audio) shows Degolia arriving at the sally port around 3:03 AM, accompanied by two officers. (Doc. 54, Sally 4 at 3:03:41–55).[2] As Degolia waits to enter the facility, he is seen leaning nonchalantly against the wall, *id.* at 3:03:56–3:05:41, until an officer near the intake door motions for Degolia to approach. *Id.* 3:05:38–3:06:54.

Before entering the booking area, Degolia was searched in an enclosed vestibule between the sally port and the booking area. At 3:07 AM, surveillance footage shows a deputy leading Degolia in handcuffs into the vestibule without conflict, after which Degolia's handcuffs are removed. (Doc. 54, Booking Search at 3:07:32–54). The intake deputy seen conducting the search is Defendant Aaron Branstutter. (Doc. 61-4, Branstutter Dep. at 50–51). At the time, Branstutter had been an employee for just shy of seven months. *See id.* at 25. Branstutter stands about 5' 8" and weighs 225 pounds. *Id.* at 20. Degolia is 6' 0" and weighs roughly 210 pounds.

---

[1] Degolia admits that he was "under the influence of alcohol" but maintains that he was not "extremely intoxicated." (Doc. 61–3 at 66, 70).

[2] Degolia can be seen exiting the patrol car on the body camera footage. (Doc. 54, Ulrich Bodycam at 21:38). Although there is also no audio on this segment of video, nothing indicates Degolia was violent or disruptive upon his arrival at the sally port. *Id.* at 21:38–22:28.

(Doc. 61-3 at 54).

In the search vestibule, the video shows Degolia remove his belt, shoes, and something from his wrist, and place his hands on an adjacent wall according to Branstutter's directions. (Doc. 54, Booking Search at 3:07:54–3:09:29). Branstutter then searches Degolia without incident. *Id.* at 3:09:29–3:10:23. Degolia is shown exiting the search vestibule where Branstutter remained. (Doc. 54, Booking Search at 3:10:23–34). Although Degolia had just been charged with public intoxication, a fact Branstutter was aware of at the time, (Doc. 61-4 at 68), **Branstutter reported on the intake assessment form he completed that Degolia did not engage in any assaultive or violent behavior**. (Doc. 1-1); (Doc. 1, ¶ 11).[3]

### C.     Takedown and Restraint in the Booking Area

Surveillance footage shows Degolia enter the booking area at 3:10 AM, without handcuffs, and approach the booking counter to complete paperwork. (Doc. 54, Booking Admin Pt. 1 at 3:10:35–47). The booking clerk interacting with Degolia from behind the counter is Katlyn Beatty. (Doc. 61-5, Beatty Dep. at 10, 49–50).

Shortly thereafter, Defendant Michael Crouthers is seen entering the booking area and stands a few feet behind Degolia. (Doc. 54, Booking Admin Pt. 1 at 3:11:07–14). Less than two minutes later, Degolia turns and appears to say something to

---

[3] There is no audio on the video surveillance, but Branstutter stated at deposition that Degolia "might have been a little mouthy" in the search vestibule. (Doc. 61-4 at 58).

Crouthers, and then casually sits down in a chair in front of the booking counter. *Id.* at 3:12:41–54. Beatty testified that prior to Degolia sitting down she was asking him medical questions when Degolia told Beatty that he wanted to talk to his attorney and did not want to answer any more questions. (Doc. 61-5 at 53, 56). As a result, Beatty suspended Degolia's booking, told him to sit down, and called out the situation to those on the floor. *Id.* at 53, 60–61, 65. Beatty testified that Degolia did not yell at her, did not "cuss" at her, did not engage in "violent behavior," and did not do anything disruptive toward her or anyone else in the booking area. (Doc. 61-5 at 83–84, 90–93, 95).

For the next two minutes, the video shows Degolia sitting in a chair with his arms folded across his chest as Crouthers moves about the booking area. (Doc. 54, Booking Admin Pt. 1 at 3:13:07–3:15:07).[4] Crouthers then approaches Degolia from behind and stands next to Degolia. *Id.* at 3:15:01–06. The two appear to engage in a brief conversation. *Id.* at 3:15:07–35. Crouthers testified that at that time he asked Degolia to stand up. (Doc. 61-7 at 69–70).[5] Crouthers, nevertheless, walks away and

---

[4] When Defendant Crouthers' deposition was taken, he testified that he had not seen any of the video footage of the events in question. (Doc. 61-7 at 21–22).

[5] Defendant Crouthers was asked at deposition to identify "each time somebody told Degolia to stand up and cooperate" and the following exchange occurred:

A:  I'll attempt, but without the audio, I don't know how I'm supposed to do that.

Q:  Well, can you remember what you were doing that night when you were interacting with him?

Degolia returns to folding his arms across his chest. (Doc. 54, Booking Admin Pt. 1 at 3:15:07–53).

According to the surveillance footage, at approximately 3:16 AM Defendant Branstutter enters the booking area from the search vestibule and touches Degolia's shoulder on the way to delivering some paperwork to the booking counter. *Id.* at 3:16:00–04. Branstutter, thereafter, pauses next to Degolia and there is a brief exchange of inaudible words. *Id.* at 3:16:04–14.[6] Degolia continues to sit and fold his arms as Branstutter walks out of view in the direction of the search vestibule behind Degolia. *Id.* at 3:16:14–18. Branstutter testified that he went back into the search vestibule to assist another deputy, Defendant Amanda Armstrong. (Doc. 61-4 at 63). At this time, Defendant Crouthers is at the end of the booking area furthest from the surveillance camera (and from where Degolia is sitting) and is walking toward Degolia. *Id.* The only other individual that can be seen on the booking floor is Nurse Gurren in a bright yellow top and white pants at the booking counter, presumably speaking to someone. *Id.*; (Doc. 61-5, Beatty Dep. at 84, 108, 113; Doc. 61-4 at 46, 129). Degolia is still sitting in the chair, almost motionless, with his arms folded. (Doc. 54, Booking Admin Pt. 1 at 3:16:15–22).

---

A:  No. It was over a year and a half ago.

(Doc. 61-7 at 63–64).

[6] What was said exactly is not addressed in either Branstutter or Degolia's deposition.

The next one and one-half minutes of surveillance footage capture events giving rise to this lawsuit. *Id.* at 3:16:18–3:17:39. At the beginning, Crouthers is seen walking toward the surveillance camera near where Degolia is sitting. *Id.* at 3:16:18–20.[7] Defendant Branstutter then walks briskly into view from the direction of the search vestibule just as Crouthers is nearing the door to the search vestibule. *Id.* at 3:16:20–23.[8] Crouthers and Branstutter merge into synchronized paths and begin to approach Degolia from the blind spot over his right shoulder. *Id.* The two deputies flank Degolia on each side. *Id.* at 3:16:22–24.[9] Immediately, Branstutter grabs Degolia underneath his left arm, Crouthers grabs Degolia's right arm, and each deputy appears (almost imperceptibly) to lift or tug at Degolia. *Id.* at 3:16:23–25. Degolia does not rise but quickly pulls his left arm back from Branstutter just as Crouthers moves to set some paperwork in his hand on the booking counter. *Id.* at 3:16:25–6.[10] Branstutter testified that he does not specifically recall whether he

---

[7] According to Crouthers' testimony it is about at this time, as he was approaching Degolia, that he stated something to the effect of "please stand up, let's go, get up . . . ." (Doc. 61-7 at 21).

[8] Branstutter claims that from where he was in the search vestibule, he "heard a commotion or something" or that "somebody was getting loud out in the booking area," (Doc. 61-4 at 80–81), and also overheard Crouthers ask Degolia to "get out of the chair" as Crouthers was walking toward Degolia. (Doc. 61-4 at 88–89).

[9] Branstutter avers that when he came out of the search vestibule and approached Degolia's left side he asked Degolia to "get up" or "get out of the chair." (Doc. 61-4 at 88–90).

[10] Crouthers testified that he and Branstutter tried to pick Degolia up but he "jerked away from us." (Doc. 61-7 at 68). Both deputies also claim Degolia responded by telling them either "don't fucking touch me" or "fuck off." (Doc. 61-7 at 15, 28; Doc.

attempted to lift Degolia but claims Degolia "went dead weight" and "just didn't help . . . he didn't try to stand up." (Doc. 61-4 at 87, 91).

Within a split second, Branstutter quickly grasps Degolia's neck with his right arm in a headlock-type chokehold and forcefully slings Degolia to the left and onto the floor. *Id.* at 3:16:26–30. Because Crouthers was busy setting his paperwork down on the booking counter, his reaction is slightly delayed as he scrambles to reach for Degolia on the floor. *Id.*

As Branstutter and Degolia come down on the floor, Branstutter is positioned on top and still has Degolia in a headlock with his right arm. *Id.* Less than a second elapses before Branstutter begins using his left hand in a closed fist to strike Degolia two to three times in the head region. *Id.* at 3:16:30–31; *id.* at 3:16:31–35. With both deputies on top of Degolia trying to restrain him, Branstutter then delivers at least four more closed-fist blows to Degolia's head. *Id.* at 3:16:35–41. A struggle ensues with Degolia on his knees and the deputies on top, but Branstutter maintains the headlock on Degolia as each deputy wrestles to grab hold of one of Degolia's arms. *Id.* at 3:16:40–54. Degolia eventually breaks free of Branstutter's headlock, but the two deputies remain on top of Degolia as they struggle to handcuff him. *Id.* at 3:16:54–3:17:01.

---

61-4 at 88). Beatty testified only that she remembers a deputy, which she believes was Crouthers, had told Degolia to stand up "more than once." (Doc. 61-5 at 79, 81–83, 95). Degolia testified, however, that "nobody told me to stand or do anything." (Doc. 61-3 at 85–86).

At that moment, Defendant Armstrong enters the booking area, walks to where the skirmish is taking place (now several feet from where Degolia was once sitting) and grabs hold of Degolia's right hand. *Id.* at 3:17:02–13. Degolia is shown lying face down and the deputies are able to handcuff Degolia's hands behind his back. *Id.* at 3:17:13–23. Sergeant Landrum then walks into the scene and observes as Defendants Branstutter, Crouthers, and Armstrong finish restraining Degolia, lift him to his feet, and escort him out of view. *Id.* at 3:17:23–41; (Doc. 61-7 at 63).

The incident report Sergeant Landrum later completed states that he was "contacted by Deputy Branstutter via institutional radio to report to booking for Inmate being [*sic*] disruptive and failing to follow deputy instructions." (Doc. 1-3). Indeed, Branstutter testified as well that he called for Landrum over the radio prior to the takedown. (Doc. 61-4, Branstutter Dep. at 85–86).

### D.    Inside Cell B2

Degolia is next seen on video surveillance in another area of the KC Detention Center as he is led to booking cell B2 by Crouthers and Branstutter, with Armstrong and Landrum in tow. (Doc. 54, Booking Cells Pt. 1 at 3:17:44–49); (Doc. 61-4 at 111; Doc. 61-7 at 71). A different segment of video footage taken from a handheld device (which includes audio) shows Degolia inside the cell, kneeling with his hands cuffed behind his back. Landrum is standing at Degolia's side while Crouthers is holding Degolia's arms slightly elevated behind his back and exerting downward pressure on Degolia's neck. (Doc. 54, Degolia Safety Chair at 0:00:00–06). For nearly a minute

Degolia is not resisting but is lamenting about what just occurred in the booking area. *Id.* at 0:00:06–53.

Degolia asks Crouthers to "let go," and when Crouthers does not comply with the request, Degolia begins to shout, curse, and struggle. *Id.* at 0:00:53–1:06. Crouthers and Landrum assist Degolia to his feet and walk him to the "Safety Chair" stationed outside the cell. *Id.* at 0:01:06–26.

### E.     The "Safety Chair"

Both Crouthers and Branstutter testified that it was Landrum's decision to place Degolia in the Safety Chair. (Doc. 61-7 at 35–36, 72–73; Doc. 61-4 at 111–12). Outside Degolia's cell, Branstutter and Crouthers are shown securing Degolia in the Safety Chair with straps at seven points of contact. (Doc. 54, Degolia Safety Chair at 0:01:26–0:04:21); (Doc. 61-4 at 112–12; Doc. 61-7 at 73–75, 91). Degolia's left eye is already beginning to swell. There is some taunting and jeering from Degolia and at one point, Degolia turns his head to Crouthers and threatens to "snap your head right off your fucking shoulders." (Doc. 54, Degolia Safety Chair at 0:01:34–50).

The deputies are able to secure Degolia in the chair without incident. Nurse Gurren then appears in the frame, checks each point of contact on the restraints, and signals her approval. (Doc. 54, Degolia Safety Chair at 0:04:26–41); (Doc. 61-7 at 91; Doc. 61-4 at 46, 115). With Degolia secured in the Safety Chair, overhead surveillance footage shows that Degolia was wheeled into cell B2 at 3:23 AM. (Doc. 54, Booking Cells Pt. 1 at 3:23:05–3:24:57); (Doc. 61-7 at 91; Doc. 61-4 at 112–13).

While Landrum is in the cell with Degolia, Branstutter can be seen on surveillance footage from outside the door rubbing and stretching his left hand—the same hand used moments before to strike Degolia repeatedly in the face. (Doc. 54, Booking Cells Pt. 1 at 3:24:30–48). Degolia remained in the restraint chair for just over two hours, until, as Degolia alleges and records confirm, Degolia was released from the chair sometime between 5:25 and 5:34 AM. (Doc. 1, ¶ 19); (Doc. 1-3, Incident Report at 1); (Doc. 61-3 at 124); (Doc. 61-10).

Beginning at 5:36 AM, Degolia completed his booking paperwork, (Doc. 54, Booking Admin Pt. 2 at 5:36:33–5:44:02), and was photographed and fingerprinted, (Doc. 54, Booking Print Pt. 1 at 5:44:14–5:51:25), all without any altercation. Degolia was released that same day and is seen on surveillance video exiting the KC Detention center at 12:35 PM. (Doc. 54, Vestibule C20 at 12:35:23–27); (Doc. 61–7 at 108).

Degolia suffered a black eye, (Doc. 1-5), and he alleges jaw injuries, a cracked molar, and emotional trauma, as well as some residual soreness from the restraint cuffs on the Safety Chair that lasted for a month after the incident. (Doc. 1, ¶¶ 33, 41, 52–57); (Doc. 61–3 at 23, 45, 112). This lawsuit followed on December 14, 2017.

## LEGAL STANDARD

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving

*Neil Degolia v. Kenton County* et al.

party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). "A *genuine* issue of *material* fact exists when, 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010) (emphasis added) (quoting *Anderson*, 477 U.S. at 249). When the issue is a "pure question of law," extraneous facts that do not bear on that question are "immaterial." *See, e.g.*, *Chappell v. City of Cleveland*, 585 F.3d 901, 909–914 (6th Cir. 2009) (citing *Scott*, 550 U.S. at 381 n.8).

"The summary judgment standard does not change simply because the parties presented cross-motions." *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 311 (6th Cir. 2010). "[R]ather, a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (citations and internal quotation marks omitted). "If the movant bears the burden of persuasion at trial on the issue contested"—whether it be a claim for relief or an affirmative defense—"the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it." 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.40(c) (Matthew Bender 3d ed. 2018) [hereinafter "MOORE'S"]; *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).

The Supreme Court, however, has "clarified the summary-judgment standard for excessive-force claims, rejecting the argument that the question of objective reasonableness is 'a question of fact best reserved for a jury.'" *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (quoting *Scott*, 550 U.S. at 381 n.8). "At the summary judgment stage . . . once [the court has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [a defendant's] actions . . . is a pure question of law." *Id.* (quoting *Scott*, 550 U.S. at 381 n.8).

## ANALYSIS

### I.     Procedural Matters

Before turning to the merits of the case, some housekeeping is required to frame the procedural posture of this matter.

#### A.     Degolia's Untimely Cross-Motion for Summary Judgment

The problem here is that Degolia's response in opposition to Defendants' motion for summary judgment was also captioned as a cross-motion for summary judgment (Doc. 62), and was filed nearly two weeks after the deadline for dispositive motions. (Doc. 60). The Clerk of Court noted the error in the docket and re-filed the same materials as Degolia's cross-motion for summary judgment. (Doc. 63). This, in turn, led to the host of motions now before the Court.

Having considered the matter, the Court will grant Degolia's motion for leave

to file an affidavit as a surreply to the motion to strike (Doc. 74), deny Defendants' motion to strike (Doc. 64), and grant Degolia's subsequent motion to extend the deadline to file a dispositive motion (Doc. 67).

Therefore, Degolia's cross-motion for summary judgment (Doc. 63) is timely and appropriately before the Court. This does not result in any prejudice to Defendants because Degolia moved for summary judgment only as to the issues of qualified immunity and the use of excessive force. These same issues were fully briefed by the parties on Defendants' motion for summary judgment and are "pure question[s] of law" when video footage establishes the relevant material facts. *See, e.g., Scott*, 550 U.S. at 381. Accordingly, the Court will view the issues of excessive force and qualified immunity as on cross-motions for summary judgment.

### B.  Degolia's Amended Complaint

On May 6, 2019, Degolia filed an Amended Complaint, alleging a "*Monell*-style municipal liability claim against the Kenton County Fiscal Court." (Doc. 78, ¶ 85). Previously, at oral argument, Degolia's counsel had suggested they might amend the Complaint to add such a claim and the Court indicated that the amendment would be permitted. After further consideration, however, the Court concludes otherwise.

The time period for amendments has passed, and thus "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(1)–(2). Although a court "should freely give leave [to amend a complaint] when justice so requires," it is within a district court's discretion to permit the

amendment. *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 551 (6th Cir. 2008). It may be appropriate to deny leave to amend in cases where there is "'*undue delay*, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962) (emphasis added)). At some point, a party's delay justifies denying leave to amend when the "delay" become "undue," "placing an unwarranted burden on the court," or "'prejudicial,' placing an unfair burden on the opposing party." *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 806 (6th Cir. 2005) (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)). "When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 459 (6th Cir. 2001).

Here, undue delay exists. Degolia has offered no explanation or justification for having waited a nearly a year and a half since the commencement of this action before amending his Complaint to add an explicit *Monell* claim. Degolia originally named Kenton County, Kenton County Fiscal Court, and the KC Detention Center, but asserted his claims against these entities under a *respondeat superior* theory. Discovery was then conducted, both parties moved for summary judgment, the parties briefed the liability of these entities, and oral argument was held. (Doc. 61-1 at 27–28; Doc. 63 at 20–21; Doc. 65 at 9–10). An amendment to the Complaint at this

late in the proceedings would prejudice Defendants.

Degolia, however, is not prejudiced by this result. As explained *infra* Part III, Degolia's Complaint effectively alleged a *Monell* claim by virtue of having sued the individual Defendants in their official capacity. Degolia has simply failed to develop his § 1983 claims against the named municipality and its subdivisions. But justice does not require another period of discovery and a second bite at the apple.

Accordingly, the Amendment Complaint tendered to the Court (Doc. 78), will be stricken from the record.

## II.    § 1983 CLAIMS (COUNTS I & II) – INDIVIDUAL LIABILITY

Degolia brings Counts I and II of the Complaint under 42 U.S.C. § 1983 and asserts that he was deprived of his federal constitutional right to be free from excessive force and cruel and unusual punishment. (Doc. 1, ¶¶ 26–41).[11] In defense, Defendants assert that they are insulated by qualified immunity.

---

[11] Degolia also alleges in Counts I and II that his claims for excessive force and cruel and unusual punishment are cognizable under the parallel provisions of the Kentucky Constitution. *Cf.* KY. CONST. §§ 10, 17. Neither of the parties have referred to these sections in their respective motions. Section 10 of the Kentucky Constitution, however, is interpreted according to federal case law applying the Fourth Amendment to the United States Constitution. *See Rainey v. Commonwealth*, 197 S.W.3d 89, 91 (Ky. 2006); *Wilkerson v. City of Frankfort*, No. 3:08-12-DCR, 2009 WL 1033828, at *5 (E.D. Ky. Apr. 16, 2009). Likewise, "Section 17 of the Kentucky Constitution accords protections parallel to those accorded by the Eighth Amendment to the U.S. Constitution." *Turpin v. Commonwealth*, 350 S.W.3d 444, 448 (Ky. 2011). Accordingly, the Court's analysis applies with equal force to Degolia's claims under the Kentucky Constitution.

## A. Legal Framework

### 1. Qualified Immunity

"Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). Qualified immunity does not apply if: (1) the facts, viewed in the light most favorable to plaintiff, "show the officer's conduct violated a constitutional right" and (2) "the right was clearly established . . . in light of the specific context of the case." *Scott*, 550 U.S. at 377 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The sequence in which each step is addressed is discretionary. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But if either is not satisfied, qualified immunity will shield the officer from civil damages. *Id.*

### 2. Excessive Force

"An excessive-force claim may arise under the Fourth, Eighth, or Fourteenth Amendments depending on 'whether the plaintiff was a free citizen, *convicted* prisoner, or fit in some gray area in between the two.'" *Kulpa v. Cantea*, 708 F. App'x 846, 851 (6th Cir. 2017) (emphasis added) (quoting *Burgess*, 735 F.3d at 472). Although Degolia pled his claims of excessive force and cruel and unusual punishment under the Eighth Amendment, the parties agree that the Fourth Amendment provides the appropriate lens, (Doc. 62 at 16), and rightly so. *Phelps v. Coy*, 286 F.3d 295, 300–01 (6th Cir. 2002) (holding that the Eighth Amendment did not apply to claims of excessive force during the booking process). It follows then that

Degolia's claim that he was subjected to cruel and unusual punishment is subsumed by his excessive force claims. *See Hopper v. Plummer*, 887 F.3d 744, 751–54 (6th Cir. 2018).

"Fourth Amendment protections, including those against excessive force, 'continue during booking' and at all times 'prior to a probable-cause hearing.'" *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 528 (6th Cir. 2018) (quoting *Aldini v. Johnson*, 609 F.3d 858, 865, 867 (6th Cir. 2010)). When assessing excessive force claims, the standard applied is solely an objective one. *Id.* at 528 & n.5. That is, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015); *Hopper*, 887 F.3d at 752.[12]

Whether a particular use of force was objectively reasonable "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 135 S. Ct. at 2473 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts must view the circumstances "from the perspective of a reasonable officer on the scene," and not with "the 20/20

---

[12] Although *Kingsley* involved a pretrial detainee's excessive force claim under the Fourteenth Amendment the standard is the same. *Hopper*, 887 F.3d at 752 ("[U]nder the Fourth or Fourteenth Amendments . . . we inquire whether the plaintiff has shown that the 'force purposely or knowingly used against him was objectively unreasonable." (quoting *Kingsley*, 135 S. Ct. at 2473)); *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (noting that the test "under either amendment," requires the court to "employ the same objective test for excessive force"). Thus, the distinction between the Fourth and Fourteenth Amendment standard in the context of pretrial detention is "purely academic." *Clay*, 797 F.3d at 369.

vision of hindsight" due to the reality that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97; *Mullins v. Cyranek*, 805 F.3d 760, 765–66 (6th Cir. 2015). In the context of a detainee in a government facility, courts "must also account for the . . . need to manage the facility" and, where appropriate, should defer to "policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 135 S. Ct. at 2473 (alteration in original). The analysis thus includes a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Mullins*, 805 F.3d at 766 (citations omitted). Therefore, the officer's "underlying intent or motivation," whether it be "good" or "evil," has no part in the analysis. *Graham*, 490 U.S. at 396–97; *Kingsley*, 135 S. Ct. at 2472–73.

Against this backdrop, the "totality of the circumstances" must be evaluated. *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). In the pre-trial context, a non-exhaustive list of relevant factors include: (1) "the relationship between the need for the use of force and the amount of force used"; (2) "the extent of the plaintiff's injury"; (3) "any effort made by the officer to temper or to limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was ***actively***

*resisting*." *Kingsley*, 135 S. Ct. at 2473 (emphasis added); *Hanson*, 736 F. App'x at 529; *see also Graham*, 490 U.S. at 396 (noting that "the severity of the crime at issue" is a relevant factor).

In the end, the litmus test is whether, on balance, an act of "'gratuitous violence' has been inflicted," *See Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 539 (6th Cir. 2015), so as to cross "the *constitutional* line" that lies beyond "common-law assault." *Hanson*, 736 F. App'x at 530.

### B.    Analysis: The Deputies' Use of Force

Because this case involves multiple uses of force, the reasonableness of the individual Defendants' actions must be analyzed "in chronological 'segments.'" *See, e.g.*, *Hanson*, 736 F. App'x at 529 (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996)); *Morrison v. Bd. of Trs.*, 583 F.3d 394, 401 (6th Cir. 2009). Moreover, "[e]ach defendant's liability must be assessed individually based on [their] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

This case involves the actions of Defendants Armstrong, Crouthers, and Branstutter, each with varying roles in four discrete uses of force: (1) the initial takedown and restraint in the booking area (including the use of a chokehold and closed-fist strikes immediately following the takedown); (2) the events immediately following in cell B2; (3) the use of the restraint chair; and (4) the extended use of the restraint chair for more than two hours.

In evaluating the circumstances, "where, as here, there is 'a videotape

capturing the events in question,' the court must 'view[] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott*, 550 U.S. at 378–81). At the summary judgment stage, *Scott* then "instructs [courts] to determine as a matter of law whether the events depicted on the video . . . show that the Officers' conduct was objectively reasonable." *E.g.*, *Dunn*, 549 F.3d at 353; *Scott*, 550 U.S. at 381 n.8 ("[T]he reasonableness of [the defendants'] actions . . . is a pure question of law."); *id.* at 378–80 (reversing lower court for error in finding a genuine issue of material fact); *Brown v. Chapman*, 814 F.3d 447, 458 (6th Cir. 2016); *Chappell*, 585 F.3d at 909.

With the above legal framework in mind, each Defendant's liability is discussed in turn.

### a. Defendant Amanda Armstrong

Degolia's § 1983 claims against Armstrong fail as a matter of law. Liability will attach to "officers who were not actually involved in the challenged conduct . . . only if those officers 'observed or had reason to know that excessive force would be or was being used *and* had both the opportunity and the means to prevent the harm from occurring.'" *Ondo v. City of Cleveland*, 795 F.3d 597, 611 (6th Cir. 2015) (emphasis added) (quoting *Burgess*, 735 F.3d at 475).

As the video evidence shows, Armstrong's only involvement in the challenged conduct in the booking area was to assist in handcuffing Degolia after he had already been subdued. This is a *de minimis* level of force that does not "cross the

*Neil Degolia v. Kenton County* et al.

*constitutional* line." *Hanson*, 736 F. App'x at 530. Indeed, when asked whether "anything Defendant Armstrong did constituted excessive force," Degolia candidly replied, "Not that I can recall." (Doc. 61-3 at 34). Moreover, the record is devoid of any evidence that Armstrong observed or should have known of the other Defendants' actions, much less that she had "both the opportunity and the means to prevent" the swift takedown and ensuing facial strikes to Degolia from her position inside the search vestibule. *See Burgess*, 735 F.3d at 475–76.[13] Armstrong's mere presence simply will not support an excessive-force claim against her. *Id.*

Because Armstrong did not violate Degolia's constitutional rights, she is entitled to qualified immunity. Accordingly, the § 1983 claims against Armstrong (Counts I & II) will be dismissed with prejudice.

### b. Defendant Michael Crouthers

#### 1. Booking Area – Crouthers

Crouthers' involvement is similar to that of Armstrong. Branstutter testified that he, independently, made the decision to take down Degolia. (Doc. 61-4 at 131–32). The video, moreover, clearly shows that Crouthers was attempting to place some paperwork on the booking counter when Branstutter grabbed Degolia and threw him to the floor. Crouthers stumbled to catch up with what had just occurred, and before

---

[13] Although Armstrong was the individual with a handheld device recording the events in the Cell B2 and the use of the restraint chair, as detailed below, the challenged conduct in these segments was not objectively unreasonable.

*Neil Degolia v. Kenton County* et al.

23

he could gain his footing, Branstutter had delivered a series of blows to Degolia's head. The video plainly shows that Crouthers did not strike Degolia or use force that can be classified as excessive or "gratuitous."

In the split-second that these events occurred, Crouthers cannot be charged with knowledge that excessive force would be or was being used. Nor can it be said that Crouthers "had both the opportunity and the means to prevent the harm from occurring." *Ondo*, 795 F.3d at 611; *Burgess*, 735 F.3d at 475 (holding that the incident did not "last[] long enough for [the officers] to both perceive what was going on and intercede to stop it."); *Kowolonek v. Moore*, 463 F. App'x 531, 539 (6th Cir. 2012) (concluding that the "rapid sequence of events" compelled the conclusion that "the officers did not have the opportunity to intervene to prevent the harm from occurring."); *Turner v. Scott*, 119 F.3d 425, 429–30 (6th Cir. 1997) ("[N]o jury could possibly be permitted to find that [the officer] knew or should have known about the initial impact.").

Crouthers' only *actual* involvement in the events in the booking area was in the scramble to secure Degolia. But "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation and quotation marks omitted); *see Hanson*, 736 F. App'x at 531 (viewing video evidence and holding, as a matter of law, that a "shove" by one of the officers was objectively reasonable). In light of the video that depicts Crouthers merely on top of Degolia struggling to grab a hold

of Degolia's hands, the Court concludes that Crouthers' conduct was objectively reasonable.

Therefore, there is no constitutional violation. At the very least, Degolia has not identified a case that clearly establishes the alleged constitutional violation such that it would "clearly prohibit [Crouthers'] conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Accordingly, Crouthers is entitled to qualified immunity for his conduct in the booking area.

### 2.    Events in Cell B2 – Crouthers

The video evidence establishes that Crouthers is ***the only*** Defendant with any involvement in the alleged excessive force that occurred when Degolia was initially brought to cell B2. Degolia avers that when he was in handcuffs and on his knees in the cell, Crouthers had a hold of "my right arm and was raising it. As he was pushing down on the back of my neck . . . and I thought my arm was going to dislocate." (Doc. 61-3 at 105).

The video footage, however, contradicts Degolia's contention that his arms were being hyperextended and establishes that Crouthers did not use constitutionally excessive force. The video shows Crouthers merely holding Degolia's arms slightly elevated behind his back while exerting downward pressure on Degolia's neck. (Doc. 54, Degolia Safety Chair at 0:00:06–53). When there is "video evidence contradicting a plaintiff's claims," there is no issue of fact and summary judgment is appropriate. *See Lee v. City of Norwalk*, 529 F. App'x 778, 782–83 (6th Cir. 2013) (citing *Scott*, 550

U.S. at 381; *Marvin v. City of Taylor*, 509 F.3d 234, 249 (6th Cir. 2007)).

The Sixth Circuit has found that conduct similar to Crouthers' does not violate the constitution. *See Lee*, 529 F. App'x at 782–83 (no constitutional violation where the video showed that the officer "took hold of [the suspect's] sleeves . . . then applied force to her neck with his forearm"); *Marvin*, 509 F.3d at 249 (finding officers acted in an objectively reasonable manner where the booking room video showed officers "bringing [the suspect's] arms behind his back and, . . . holding his right arm over his head"). Degolia has not directed the Court to any authority that states otherwise. Thus, the Court concludes that Crouthers' conduct in cell B2 was objectively reasonable.

Because Degolia has failed to establish a constitutional violation, Crouthers is entitled to qualified immunity for the constitutional claims arising from the events in Cell B2.

### 3.    Use of the Restraint Chair – Crouthers

The video recordings show that it was Branstutter and Crouthers who secured Degolia in the restraint chair.[14] Degolia alleges in Count II that placing him in the chair, and keeping him in it for just over two (2) hours, was "cruel and unusual punishment" and "excessive force" under the Eighth Amendment. (Doc. 1, ¶¶ 19, 36–

---

[14] It remains uncontested that Sergeant Landrum made the decision to place Degolia in the Safety Chair. (Doc. 61-7 at 12–13); (Doc. 61-4 at 111–12); (Doc. 1-3 at 3). But Landrum is not a party in this case.

37). As noted above, however, the Fourth Amendment's "objective reasonableness" standard applies due to Degolia's status as an unconvicted detainee. *Phelps*, 286 F.3d at 300–01.

Defendants argue that the use of the restraint chair, the manner in which Degolia was secured in it, and the time Degolia spent in the chair do not offend the Constitution. (Doc. 61-1 at 24–27). Degolia makes no argument in response. As a practical matter, "it is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Rouse v. Caruso*, No. 6-cv-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011). Moreover, in failing to address Defendants' argument, Degolia has failed to show that "the unlawfulness of [the deputies'] conduct was 'clearly established at the time.'" *Wesby*, 138 S. Ct. at 589 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

Further, the Court independently concludes it was not objectively unreasonable for Crouthers to place Degolia in the chair and keep him in it for approximately two hours.[15] The video, with the added benefit of audio, clearly shows that when Degolia was in handcuffs and positioned on his knees, he began struggling,

---

[15] Contrary to Degolia's contention, the force used to secure Degolia in the chair, as shown in the video, is unquestionably "a de minimis level of [force] with which the Constitution is not concerned." *Hanson*, 736 F. App'x at 530 (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 n.21 (1979)).

yelling, and cursing at Crouthers. Thus, Degolia was actively resisting. *See Rudlaff v. Gillespie*, 791 F.3d 638, 641 (6th Cir. 2015). It cannot be said that under these circumstances it was constitutionally impermissible for Crouthers to secure Degolia in the restraint chair in order to avoid another violent confrontation. Indeed, in a case involving a booking-room altercation, the Sixth Circuit observed that "pepper spray, Tasers, arm bars, restraint devices, spit hoods, etc. all have their legitimate place." *See, e.g., Jennings v. Fuller*, 659 F. App'x 867, 871 (6th Cir. 2016) (collecting cases).

A different result does not obtain merely because, as Degolia argues, he was in handcuffs and on his knees in a cell where the deputies "could have" left him. (Doc. 62 at 11). "The Fourth Amendment . . . does not require police officers to take the better approach. It requires only that they take a reasonable approach." *Cook v. Bastin* (In re *Estate of Campbell*), 590 F. App'x 523, 528 (6th Cir. 2014). And here, the use of the restraint chair was objectively reasonable.

But even assuming the opposite is true, Degolia has not pointed to any binding precedent suggesting, much less clearly establishing "beyond debate," that in the pretrial context (and under similar circumstances) either the use of a restraint chair or being kept in a restraint chair for just over two hours violates the Constitution.[16]

---

[16] That Defendants allegedly violated KC Detention center policies by using the restraint chair does not change the outcome. *See* (Doc. 62 at 14–15); (Doc. 1-4, KC Detention Center Policy No. 3.2.34 § III, at 10 (stating that the Safety Chair is for a prisoner "whose behavior demonstrates their intent to cause injury/harm to [themself] or others, or whose actions may result in the destruction of property. The [Safety Chair] should be utilized when less restrictive alternatives have failed, appear likely to fail, or it is apparent that they will be ineffective in controlling a

*See Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013).

Therefore, Crouthers is entitled to qualified immunity insofar as it concerns the restraint chair. Counts I and II against Crouthers will accordingly be dismissed with prejudice.

### c. Defendant Branstutter

### 1. Booking Area – Branstutter

The video footage of the booking area plainly shows Degolia sitting in a chair with his arms folded when Defendant Branstutter approached from behind and almost instantaneously grabbed Degolia in a headlock-type chokehold, threw him to the floor, held him in a one-armed chokehold, and then immediately struck him repeatedly in the head. The primary question presented by the parties is whether Degolia's conduct in the booking area equates to "active resistance" so as to justify the violent force used by Branstutter. Applying the *Kingsley-Graham* factors to these facts, the Court concludes that the force used by Branstutter was objectively unreasonable.

### i. Degolia Did Not Actively Resist

The general rule is that when a detainee "poses no threat to others and is not

---

violent, dangerous, or disordered prisoner's behavior or threat."). "It must have been clearly established that the conduct at issue violates the Constitution, not internal policies." *Latits*, 878 F.3d at 553; *see also City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) ("Even if an officer acts contrary to her training, however . . . that does not itself negate qualified immunity where it would otherwise be warranted.").

trying to escape," a "spontaneous assault" or "unprovoked and unnecessary blow" is grounds for an excessive force claim. *See Coley*, 799 F.3d at 538.

Here, Degolia was arrested for intoxication, which is "not a severe offense that would support a greater use of force." *See Lustig v. Mondeau*, 211 F. App'x 364, 370 (6th Cir. 2006). Then, when viewing the instant scene from the perspective of a deputy in the booking area, no reasonable deputy would infer that Degolia posed a threat to staff or other individuals present. Moreover, nothing in the video footage suggests that Degolia's conduct threatened "internal order and discipline" or the ability of officials "to maintain institutional security" such that the problem needed to be quelled with violent force. *Kingsley*, 135 S. Ct. at 2473; *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002).

It bears emphasis that Defendants do not contend that Degolia was causing a disturbance in the booking area or threatening the booking clerk when he refused to answer standard medical questions and asked for an attorney.[17] Indeed, although there is no audio on the surveillance video, Beatty (the booking clerk with whom Degolia dealt with directly) testified unequivocally that Degolia did not yell at her, did not "cuss" at her, did not engage in "violent behavior," and did not do anything

---

[17] Defendants concede that Degolia's noncompliance with the booking process is immaterial because the force at issue was not used to gain Degolia's compliance. (Doc. 61-1 at 4). Indeed, as Beatty testified, whether or not a detainee is cooperative they are taken to a cell. (Doc. 61-5 at 97). Moreover, if Degolia ever was "getting loud," even Branstutter testified that this would be no reason to use a takedown maneuver. (Doc. 61-4 at 82).

disruptive toward her or anyone else in the booking area in the moments leading up to the takedown. (Doc. 61-5 at 83–84, 90–93, 95). Thus, the undisputed context of the incident suggests that it was objectively unreasonable for Branstutter to instantly employ violent tactics.

Branstutter attempts to change the tide by arguing that other factors made his actions reasonable. But in doing so, Branstutter has taken liberties with the facts. (Doc. 61-1 at 15–18). At summary judgment, this is unavailing. Regardless of Branstutter's recollection of the events, this Court cannot rely "on such visible fiction"; it must "view[] the facts in the light depicted by the videotape[s]." *E.g., Scott*, 550 U.S. at 381.

Branstutter points to three aspects of the situation to justify the force used: (1) Degolia's relative size; (2) his intoxication; and (3) his "active resistance" toward the deputies. (Doc. 61-1 at 15–17).

The first two considerations are without merit. With respect to size, Degolia weighs 210 pounds, (Doc. 61-3 at 54), Branstutter weighs 225 pounds. (Doc. 61-4, Branstutter Dep. at 20), and although the record does not indicate Crouthers' weight, it is apparent from the video that Crouthers is the largest of the three. Coupled with the fact that Degolia was alone and sitting virtually motionless, Branstutter's claim that Degolia somehow posed a threat as he sat with his arms folded is nothing more than inchoate speculation.

As to Degolia's intoxicated state, that alone does not justify Branstutter's use

of force. The Sixth Circuit has repeatedly observed that although "heavy intoxication may, on its own, render it reasonable to handcuff an individual, the reasonableness of the force used to effectuate the seizure . . . will generally depend upon other circumstances, such as the individual's *resistance* and *hostility*." *Stanfield v. City of Lima*, 727 F. App'x 841, 847 (6th Cir. 2018) (quoting *Solovy v. Morabito*, 375 F. App'x 521, 525 n.4 (6th Cir. 2010)); *Marvin v. City of Taylor*, 509 F.3d 234, 246, 249 (6th Cir. 2007) (holding that where an elderly suspect in an "intoxicated condition . . . . swung his right fist" at one of the officers in the booking room, the officers acted reasonably to subdue the suspect by holding his arm overhead). Thus, the mere fact that Degolia was under the influence of alcohol does not answer the question of whether it was objectively reasonable to resort to violence.

That leaves the final factor cited by Branstutter: that Degolia "actively resisted." "Active resistance" has been described by the Sixth Circuit as:

> [P]hysically struggling with, threatening, or disobeying officers. And it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance. But active resistance does not include being compliant or having stopped resisting; or having done nothing to resist arrest, or having already been detained. A simple dichotomy thus emerges: When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.

*Rudlaff v. Gillespie*, 791 F.3d 638, 641 (6th Cir. 2015) (internal citations and quotation marks omitted) (finding tasing reasonable where claimant "puffed out his chest and stared down [the officer]," then *swung his arms twice toward officers*). Active resistance typically involves "a series of consciously-resistive acts" that

"unfolds in a manner where the suspect causes the officers to be exposed to volatility, hostility, and danger in a way that increases with the passage of time, thus justifying (and often requiring) the use of force." *Eldridge v. City of Warren*, 533 F. App'x 529, 534–35 (6th Cir. 2013); *see also Kelly v. Sines*, 647 F. App'x 572, 575 (6th Cir. 2016) ("[W]hen a plaintiff's actions do 'not follow the typical course of active resistance,' [the Sixth Circuit is] more inclined to deny qualified immunity.").

Degolia's conduct in the booking area does not constitute active resistance. The video shows that Degolia sat virtually motionless in a chair after filling out paperwork and none of the Defendants have testified that Degolia verbally threatened them at any time in the booking room. **Thus, the Court is left with a very narrow time frame between when Degolia sat down in the chair and when the takedown occurred, when Branstutter contends Degolia "actively resisted."** In particular, Branstutter argues Degolia "actively resisted" by: (1) failing to comply with request(s) to "stand up"; (2) pulling his arm away; and (3) using "dead-weight" or "downward pressure in the chair against Branstutter's effort to lift." (Doc. 61-1 at 5–6, 17, 19). The Court is not persuaded.

First, according to Defendants' recollection, Degolia was asked to stand roughly a minute before the takedown occurred,[18] and again as the two deputies flanked Degolia,[19] at which point Branstutter and Crouthers aver Degolia said

---

[18] *See* (Doc. 61-7 at 69–70); *cf.* (Doc. 54, Booking Admin Pt. 1 at 3:15:07–35).

[19] (Doc. 61-7 at 21); (Doc. 61-4 at 88–90); *cf.* (Doc. 54, Booking Admin Pt. 1 at 3:16:22–

something to the effect of "don't fucking touch me" or "fuck off."[20] Beatty testified that she only remembers a deputy, who she believes was Crouthers, had told Degolia to stand up "more than once." (Doc. 61-5 at 79, 81–83, 95).[21] Degolia, however, disputes this. Degolia testified that "nobody told me to stand or do anything," (Doc. 61-3 at 85–86), a fact that is not "blatantly contradicted" by the videotape. *Latits*, 878 F.3d at 544; *Coble v. City of White House*, 634 F.3d 865, 869–70 (6th Cir. 2011). But the difference in testimony here does not give rise to "the need for a trial." *Anderson*, 477 U.S. at 249–50.

Whether Degolia may have been asked to stand, at most twice, is not a *genuine* issue of *material* fact. The Sixth Circuit has long held that "mere noncompliance is not active resistance." *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423–24 (6th Cir. 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323–24 (6th Cir. 2015) (holding that refusal to comply with officer's command to step outside his apartment was not active resistance); *Eldridge*, 533 F. App'x at 535 ("If there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more.")).

Whether Degolia swore at the deputies also does not raise a *genuine* issue of

---

25).

[20] (Doc. 61-7 at 15, 28; Doc. 61-4 at 88).

[21] In the Incident Report completed just over an hour after the takedown, Branstutter and Crouthers noted in their respective accounts that they asked Degolia to stand up. (Doc. 1-3 at 1–2).

*material* fact. Noncompliance in a booking area—even when coupled with an offensive insult—is not active resistance that justifies throwing a detainee to the floor. *Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008); *see also Pershell v. Cook*, 430 F. App'x 410, 415 (6th Cir. 2011) (holding the use of a leg sweep objectively unreasonable where "[a]side from telling the officers to 'get the f— out of my house' and possibly balling up his fists as his hands hung by his sides, [plaintiff] did not resist arrest or pose an immediate danger to officers at the time he was knocked to the ground"). Thus, whether Degolia used profanity or was asked to stand is "immaterial" to the "pure question of law" regarding whether or not the use of violent force was unreasonable in light of the clear video footage. *See, e.g.*, *Chappell*, 585 F.3d at 909–914 (citing *Scott*, 550 U.S. at 380–81 & n.8). Defendants evidently concede that much.[22]

Thus, the now-distilled question is whether Degolia "actively resisted" the deputies in the narrow span of three seconds when Crouthers and Branstutter flanked Degolia and attempted to lift or pull him out of the chair. (Doc. 54, Booking Admin Pt. 1 at 3:16:24–27). "Of course, takedowns are in many circumstances appropriate, *see Hayden v. Green*, 640 F.3d 150, 154 (6th Cir. 2011), but not always,

---

[22] *See, e.g.*, (Doc. 61-1 at 5 ("[W]hether [Degolia] did or didn't cuss the deputies while in the booking is not a fact dispute preclusive of summary judgment"); (Doc. 65, Def.'s Reply at 5–6) ("Degolia was not taken to the floor for anything that he said; rather, he was taken to the floor because he would not stand up and deputies' force to lift him from the chair proved to be insufficient.").

*see Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006)." *Jennings v. Fuller*, 659 F. App'x 867, 870 (6th Cir. 2016). "The key point, . . . is whether there was some real form of resistance or danger." *Id.* Neither is present here and no reasonable officer on the scene could believe otherwise.

First, Degolia's act of pulling his arm back, seen in the video when the deputies flanked him from behind, is not the type of "physical" struggling that rises to the level of "active resistance." *Compare McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (holding that where plaintiff admittedly did not put his hand behind his back as requested and "jerked away" when the officer "screamed loudly in his ear," a reasonable jury could conclude that it was objectively unreasonable for the officer to immediately react with "a takedown maneuver."), *with Griffin v. Hardrick*, 604 F.3d 949, 952, 954–56 (6th Cir. 2010) (concluding that when the detainee "jerk[ed] her arm away" from the officer and the video "clearly" showed that the "struggling" continued as "she resisted" the officers while they were "escort[ing] her down the hallway," it was not unreasonable for the officer to employ a "leg-sweep maneuver" that brought the detainee to the floor and resulted in a broken tibia).

Further, to the extent Degolia's conduct was "somehow provocative, it was not so obviously aggressive to warrant brute physical force." *See Malory v. Whiting*, 489 F. App'x 78, 83–84 (6th Cir. 2012) (rejecting officer's attempt to associate plaintiff's noncompliance and "putting his belt on his shoulder" at the booking counter with "taking an attack stance").

*Neil Degolia v. Kenton County* et al.

In *Pelton v. Perdue*, the suspect "reflexively pulled his arm away from [the officer] and turned toward his sliding glass door after [the officer] grabbed at him" to effectuate an investigatory stop. 731 F. App'x 418, 425 (6th Cir. 2018). The Sixth Circuit rejected the officer's "attempts to shoe-horn these facts into a *Graham* 'resistance' factor" that justified tackling the suspect. *Id.* at 425–25. The rationale in *Pelton* is even more compelling in this case. When Degolia pulled his arm away, Branstutter immediately threw Degolia to the floor, despite that Degolia had not moved from the chair in which he was sitting.

Nor does the fact that Degolia was not handcuffed render Branstutter's actions objectively reasonable. *See Laury v. Rodriguez*, 659 F. App'x 837, 844 (6th Cir. 2016) (affirming denial of qualified immunity for an officer who used a takedown on a detainee who was unhandcuffed in the booking area); *Baker v. City of Hamilton*, 471 F.3d 601, 607–08 (6th Cir. 2006) ("That Baker was not handcuffed at the time he was struck does not preclude a finding of unreasonableness."); *Malory*, 489 F. App'x at 86 ("Though Plaintiff was not handcuffed . . . his resistance toward Defendants at the booking counter was sufficiently benign that a reasonable officer would have understood that it was unnecessary to tackle, step on, and punch Plaintiff to prevent him from acting violently toward the officers.").

Branstutter's argument is thus reduced to the claim that when Branstutter grabbed Degolia's arm "he went dead weight" and "just didn't help, didn't attempt to get up under his own power." (Doc. 61-4 at 87). But Branstutter's testimony is self-

defeating: Degolia was not "actively" resisting because he was not doing anything.

This view is supported by *Griffith v. Coburn*, 473 F.3d 650 (6th Cir. 2006). There, the suspect was sitting on the couch watching television and ignoring officers informing him of a warrant and requesting his date of birth. *Id.* at 652. The court did not have the benefit of video footage and there were differing accounts of what occurred. *Id.* at 652–53. According to the suspect's mother, however, her son was "leaning back but resisting only passively by 'tr[ying] to put his arm behind his back and . . . refusing to help' or cooperate in any way with the officers' commands." *Id.* at 653. An officer then "jumped on" the suspect and used a chokehold while "wrestling him." *Id.* at 653, 657. The Court held that if this version of the events were credited by a jury, then it was "objectively unreasonable" for the officer to "almost immediately and without provocation" resort to the force that was used. *Id.* at 657.

Unlike in *Griffith*, here, the Court has the benefit of video capturing the events. The video clearly shows Degolia passively sitting in the chair with his arms folded. Branstutter resorted so quickly to violent force that there was arguably no time for any person to engage in any meaningful "struggle." The fact Degolia did not stand up at the first (and only) tug from Branstutter that can be seen in the video does not equate to active resistance. "The Fourth Amendment's protections do not evaporate the moment an individual resists an officer's command." *Martin v. City of Broadview Heights*, 712 F.3d 951, 959–60 (6th Cir. 2013). Thus, as in *Griffith*, so too here. Nothing about Degolia's conduct in the booking area bears the hallmarks of "active

resistance."

The final step in the reasonableness inquiry then, is to assess the proportionality between "the need for the use of force and the amount of force used," *Kingsley*, 135 S. Ct. at 2473, and ask "whether the totality of the circumstances justifie[s] a particular sort of" force being used. *Garner*, 471 U.S. at 8–9.

The surveillance video shows that Branstutter (1) used a takedown maneuver in the form of a headlock-type chokehold; and (2) once on the floor, immediately followed with multiple closed-fist strikes to Degolia's face while maintaining a chokehold. *See Laury*, 659 F. App'x at 843 (analyzing the takedown and conduct on the floor separately). Because Degolia was not actively resisting, it was objectively unreasonable, as a matter of law, for Branstutter to employ these tactics.

### ii.  Brantutter's Initial Takedown and Chokehold

The use of force is "classified along a 'force continuum,'" with a "vascular restraint" (*i.e.*, a chokehold) lying somewhere "beyond pepper spray" and closer in similarity to batons or tasers. *Griffith*, 473 F.3d at 657; *Hanson*, 736 F. App'x at 533.

Here, Branstutter used a chokehold to throw Degolia to the ground and maintained his grip for roughly thirty seconds. (Doc. 54, Booking Admin Pt. 1 at 3:16:27–54). Branstutter's chokehold in itself is unconstitutional. *Coley v. Lucas Cty.*, 799 F.3d 530, 540–41 (6th Cir. 2015) (citing *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993) ("The use of a chokehold on an unresisting—and even an initially resistant—detainee violates the [Constitution].")); *Griffith*, 473 F.3d at 658–60

(excessive force for an officer to "almost immediately and without provocation" use a chokehold to restrain a suspect who posed no threat to the officers or to anyone else); *Hanson*, 736 F. App'x at 532–33 ("If an officer cannot tase a 'non-resistant person' '[a]bsent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm,' then he cannot choke a 'non-resistant person' for an extended period of time." (internal citations omitted)).

Where Degolia was not actively resisting, Branstutter's takedown maneuver was likewise unconstitutional. *See, e.g.*, *Lawler v. City of Taylor*, 268 F. App'x 384, 386–87 (6th Cir. 2008) (officer's "use of force in throwing [plaintiff] to the floor [in the booking room] was disproportionate to any threat he faced from [plaintiff]," given that [plaintiff] merely insulted the officer and "raised his left arm slightly"); *Stanfield*, 727 F. App'x at 847–48 (officer's "takedown was objectively unreasonable" in light of the fact that plaintiff merely "leaned forward, attempted to raise his right arm, and twisted his body to the left" while the officers were attempting to handcuff plaintiff so they could pat him down for weapons).

The unconstitutional nature of Branstutter's actions shown in the video is borne out by the fact that nothing in the video shows that Branstutter attempted to "temper or to limit the amount of force." *Kingsley*, 135 S. Ct. at 2473.[23] Rather, as

---

[23] Crouthers and Branstutter both testified that they have been instructed to achieve inmate-compliance through the use of force in three stages: "verbal control" then "soft empty-hand control" and finally "mace or . . . of course, physical force." (Doc. 61-7 at 7; Doc. 61-4 at 82–83).

evidenced by the video, within a second Branstutter went from one end of the continuum to the other in throwing Degolia to the floor.

Therefore, Branstutter's takedown and chokehold were unreasonable.

### iii. Actions on the Floor: Closed-Fist Facial Strikes

Branstutter did more than just take down Degolia. Almost immediately upon coming to the floor, Branstutter delivered 6–7 forceful closed-fist blows to Degolia's head in a matter of nine seconds. (Doc. 54, Booking Admin. at 3:16:29–39). This was excessive, gratuitous force in violation of the Constitution. *See, e.g.*, *Lawler*, 268 F. App'x at 387 (holding jury could conclude that "once [plaintiff] hit the floor . . . knee strikes and elbow jab [were] gratuitous").

To the extent Branstutter contends "the force [he] used was reasonable merely because [Degolia] offered *some* resistance before he was handcuffed, [the Sixth Circuit's] precedents foreclose this line of argument." *Martin v. City of Broadview Heights*, 712 F.3d 951, 959–60 (6th Cir. 2013). Degolia's "failure to produce his arms while he was on the ground is not the sort of 'active resistance' addressed in *Rudlaff*." *Stanfield*, 727 F. App'x at 848.

The fact that Degolia had two deputies on top of him renders Branstutter's serial facial strikes all the more unreasonable. *Malory*, 489 F. App'x at 83–84 (driving a knee into plaintiff's temple and punching him in the ribs when the struggle continued on the ground was unreasonable); *Stanfield*, 727 F. App'x at 847–48 (objectively unreasonable to administer knee strikes, fracturing plaintiff's rib, in an

attempt to secure plaintiff's arms while on the ground); *Lustig v. Mondeau*, 211 F. App'x 364, 370–71 (6th Cir. 2006) ("[I]t is sufficiently obvious under *Graham* that it would be objectively unreasonable for an officer to gratuitously cause additional pain to a nonviolent and, at most, passively resistant detainee while she is being restrained in a full control hold by two officers.").

Viewing the facts as depicted by the video evidence, Branstutter used objectively unreasonable force in violation of the Fourth Amendment.

### iv. Clearly Established Law

The final question is whether Degolia's right to be free from excessive force involving a chokehold-takedown and facial strikes under the circumstances in the booking room was "clearly established" at the time of the incident. There is no doubt that it was.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*) (citation and internal quotation marks omitted). For an alleged right to be clearly established, the doctrine of qualified immunity "do[es] not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). To that end, "clearly established law" must be defined in a "particularized" sense in light of the facts of the case and "not at a high level of generality," *White v. Pauly*, 137 S. Ct. 548, 552 (2017)

(*per curiam*) (citations and internal quotations omitted), thereby ensuring that "it would be clear to a reasonable officer that [their] conduct was unlawful in the situation [they] confronted." *Saucier*, 533 U.S. at 202.

As relevant here, the Supreme Court has observed that:

Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. Precedent involving ***similar facts*** can help move a case beyond the otherwise "hazy border between excessive and acceptable force" and thereby provide an officer notice that a specific use of force is unlawful.

*Kinsela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (emphasis added) (quoting *Mullenix*, 136 S. Ct. at 309, 312). But "just as a court can generalize too much, it can generalize too little . . . [I]t defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)." *Martin v. City of Broadview Heights*, 712 F.3d 951, 959–60 (6th Cir. 2013) (quoting *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012)).

"[T]he focus is on whether the officer had fair notice that her conduct was unlawful." *Kinsela*, 138 S. Ct. at 1152. Thus, at the end of the day, "an action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Guertin v. Michigan*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015)).

Here, a minimum of three prior cases with sufficiently similar facts involving a deputy-detainee altercation in a booking room provided Branstutter with ample notice that the force used in this incident was unlawful.

First, in *Lawler v. City of Taylor*, 268 F. App'x 384 (6th Cir. 2008), the plaintiff entered the booking room and did not put his hands on the counter when told to do so. Plaintiff then "started getting belligerent" and insulted the deputy. When plaintiff "raised his left arm slightly" the deputy "tackled him to the floor face-down, struggled with him for a few moments and struck him forcefully three times—twice slamming his knee into [plaintiff]'s back . . . and once hitting him with his elbow"—before plaintiff was handcuffed. *Id.* at 386. During the struggle, the deputy remained on top of plaintiff at all times.

The Sixth Circuit upheld the denial of qualified immunity, reasoning that the "videotape of the incident, together with [plaintiff]'s account of the verbal sparring that preceded it, would permit a jury to conclude that [the deputy]'s use of force in throwing [plaintiff] to the floor was disproportionate to any threat he faced from [plaintiff]." *Id.* at 387. In addition, the court noted that a jury could conclude that it was "gratuitous" to knee plaintiff twice in the back and hit him once with his elbow after coming down on the floor. *Id.*

Second, in *Malory v. Whiting*, 489 F. App'x 78 (6th Cir. 2012), plaintiff refused to "sign his entire name" on the booking forms. Then, when plaintiff was ordered to take his clothes off to be searched, he removed only some of his clothes and "placed

his belt over his shoulder." *Id.* at 80. The officer walked out from behind the booking counter and instructed plaintiff to place his hands behind his back. Plaintiff complied but the officer "grabbed" plaintiff's "neck and shoved him into the booking counter." The deputy then pulled plaintiff's right ankle out from under him, bringing plaintiff to the floor. The deputy then put his knee on plaintiff's "left temple and 'started driving' his knee into [p]laintiff's left ear." *Id.* at 80. Another officer handcuffed one of plaintiff's wrists but then stood on the other wrist "and punched [p]laintiff several times in the ribs." *Id.* at 80.

Again, the Sixth Circuit upheld the denial of qualified immunity, concluding that plaintiff's conduct in the booking area "was argumentative at worst." *Id.* at 83. Plaintiff "was not threatening and he offered no indication of any attempt to flee from officers," and therefore it was unreasonable for the officers to react by "slamm[ing]" plaintiff to the floor, and then drive a knee into plaintiff's temple and punch him in the ribs when the struggle continued on the ground. *Id.* at 83–84. Moreover, the court rejected defendants' argument that the right at issue was not clearly established simply because plaintiff was not handcuffed. *Id.* at 85.

Finally, in *Laury v. Rodriguez*, 659 F. App'x at 837 (6th Cir. 2016), plaintiff was "angry and cursing at the officers" and "continued to argue" about his arrest. *Id.* at 840. The officer eventually removed plaintiff's handcuffs and plaintiff sat down. *Id.* At that time, the officer asked plaintiff "to remove his coat and hand it to him without standing." But the video showed plaintiff stand, "remove his coat, and toss or 'fling'

it" toward the officer, who was about a foot away, and then sit back down. *Id.* The officer then moved quickly toward plaintiff, pushed him onto the bench, grabbed him by the neck, "choking" him, and "slam[ed] him on the ground" from the bench. *Id.* at 841. In the takedown, the officer remained on top, yet he put his knee in plaintiff's back once on the ground and "snatched" his earring out of his ear. *Id.* at 841. Another officer entered the booking room and assisted in handcuffing plaintiff. *Id.*

The Sixth Circuit reversed the district courts' decision to grant the officers qualified immunity because by "pushing [plaintiff] onto the bench, choking him, and 'slamming' him onto the floor face-first, [the officer] 'gratuitously applied additional force, which inflicted pain . . . against an individual who posed no threat to safety, did not attempt to flee, offered at most passive resistance to the officers, and was already under the officer[']s[] physical control." *Id.* at 844 (third and fourth alterations in original) (quoting *Lustig*, 211 F. App'x at 371). Similarly, the court held that a reasonable factfinder could conclude it was unreasonable for the officer to use his body weight and knee to hold plaintiff down after he did not appear to be struggling. *Id.* at 845.

It is "sufficiently clear" from these cases and the others cited above "that every reasonable official would have understood that" —grabbing Degolia in a chokehold, throwing him to the ground, and striking him in the face at least six times when Degolia posed no threat to safety or security and offered no form of active resistance— "violates [Degolia's constitutional] right" to be free from excessive force. *Cf. Mullenix*,

136 S. Ct. at 308. Therefore, Branstutter is not entitled to qualified immunity for his conduct in the booking room.

Because there is no issue of fact to be determined in light of the uncontroverted video evidence of the altercation in the booking room, summary judgment, to the extent of liability, is appropriate on Count I against Branstutter.

### 3. Use of the Restraint Chair – Branstutter

"[T]he fact that the initial takedown was clearly unconstitutional does not mean that all the [deputy's] subsequent actions are *ipso facto* not protected by qualified immunity." *Jennings*, 659 F. App'x at 871. Thus, although Branstutter participated in securing Degolia in the restraint chair after the altercation in the booking area, the analysis and result are the same as with Crouthers. *See supra*.

Accordingly, Branstutter is entitled to qualified immunity insofar as it concerns his involvement with Degolia being placed in the restraint chair.

## III. § 1983 – *MONELL* CLAIMS

Degolia has also sued the individual Defendants in their official capacities, as well as Kenton County (the "County") and a number of its subdivisions based on the doctrine of *respondeat superior*. (Doc. 1, ¶¶ 58–60, 63).

An elementary principle of § 1983 litigation is that "[a] suit against a [government] official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *See, e.g.*, *Will v. Michigan Dep't of State*

*Police*, 491 U.S. 58, 71 (1989); *Kentucky. v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Therefore, Degolia's § 1983 claims against the individual Defendants in their official capacity and Kenton County and the named subdivisions will be addressed together.

"Local governing bodies . . . can be sued directly under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (internal footnote omitted). Degolia, however, cannot ascribe liability to the County or its subdivisions based on the concept of *respondeat superior*. The rule for over forty years has been, and is, that a governmental entity "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). **Liability attaches only where a "policy or custom" of the municipal entity was the "moving force [behind] the constitutional violation."** *Id.* at 694. Where no constitutional violation occurs, the governmental entity cannot be held liable. *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 138 (6th Cir. 2014).

Thus, the excessive force claims above that survive—those against Branstutter—are the only § 1983 claims that must be analyzed. The question then is whether Degolia was subjected to a takedown, chokehold, and facial strikes because of a policy or custom of Kenton County.

## A.    Degolia has Failed to Establish a "Failure to Train" Claim

Municipal policies and customs include "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). "In limited circumstances, a local government's decision not to train certain employees . . . may rise to the level of an official government policy for purposes of § 1983." *Id.* This occurs "only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the [officers] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (emphasis added); *Connick*, 131 S. Ct. at 1359.

Degolia argues his § 1983 claims against the County and its subdivisions are cognizable under what amounts to a failure-to-train theory. (Doc. 62 at 2, 20–21).  For Degolia to prevail on his failure-to-train theory, he must show "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of [Kenton County's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused [his] injury." *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (quoting *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)). Degolia has failed to make the requisite showing.

As to the first prong, although the deputies testified that they only receive training on use-of-force from a field training officer ("FTO" training) upon being hired, (Doc. 61-4 at 25–26, 34; Doc. 61-7 at 8–9), the fact "[t]hat a particular officer may be

unsatisfactorily trained will not alone suffice to fasten liability on the [municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390–91. Thus, Degolia has merely "point[ed] to something the city 'could have done' to prevent the unfortunate incident," and that is simply not enough to make out a claim against a municipality. *Id.* at 392.

With respect to the second prong, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of the Cty. Comm'rs of Bryan Cty v. Brown*, 520 U.S. 397, 410 (1997). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 131 S. Ct. at 1360 (quoting *Bryan Cty.* 520 U.S. at 409). In other words, there must be evidence that policymakers had "notice that a course of training [was] deficient in a particular respect" and yet they continued to adhere "to an approach that they know or should know has failed to prevent tortious conduct by employees." *Id.*[24]

---

[24] There is one exception. In "a narrow range of circumstances . . . the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 131 S. Ct. at 1361. The exception applies only where "the duties assigned to specific officers or employees" make "the need for more or different training . . . so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390; *Connick*, 131 S. Ct. at 1361. The exception does not apply here because there is some form of training in place at KC Detention Center, *i.e.*, the FTO training program. (Doc. 61-4 at 25–26, 34; Doc. 61-7 at 8–9).

Degolia has failed to make any showing that Kenton County "ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (quoting *Plinton*, 540 F.3d at 464). Degolia's only argument is that because KRS § 441.055 requires Kenton County Fiscal Court to establish training requirements for deputies, and he was harmed by a deputy under that regime, *ergo* the Kenton County Fiscal Court must have been derelict in its duty to train its deputies. *See* (Doc. 62 at 20–21). The argument is fatally flawed.

"*Monell*'s rule . . . will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city [or county] is responsible." *Canton*, 489 U.S. at 389. Nor is it enough "that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id.* at 391. Thus, Degolia's argument "says little about the [KC Detention Center's] training program or the legal basis for holding [Kenton County or its subdivisions] liable." *Canton*, 489 U.S. at 391.

For all these reasons, Degolia has failed to establish that a deficiency in deputy training reflects Kenton County's deliberate indifference to the rights of pretrial detainees. Therefore, Degolia's § 1983 claims against the County and its subdivisions will be dismissed with prejudice.

*Neil Degolia v. Kenton County* et al.

## IV.   STATE-LAW CLAIMS

Defendants maintain that they are entitled to qualified official immunity under Kentucky law. This is correct in part, *except* that Branstutter is not entitled to qualified official immunity.

### A.   Qualified Official Immunity

Kentucky law holds that "qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment, (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citations omitted).

A showing of "bad faith" may be founded "on a violation of a constitutional, statutory, or other clearly established right which a person in the official's position would have known was afforded to a person in the plaintiff's position *i.e.,* objective unreasonableness." *Yanero*, 65 S.W.3d at 523; *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 481 (Ky. 2006). The Sixth Circuit and the Kentucky Supreme Court have held that the federal "qualified immunity inquiry is essentially identical to the qualified official immunity inquiry under state law." *See e.g.*, *Jefferson Cty. Fiscal Court v. Peerce*, 132 S.W.3d 824, 837 (Ky. 2004); *Woodcock*, 679 F. App'x at 425 (citations omitted) (denying defendants immunity under Kentucky law because they were not entitled to immunity under federal law); *Sloas*, 2001 S.W.3d at 481.

It follows then that in light of the above § 1983 qualified immunity analysis,

*Neil Degolia v. Kenton County* et al.

Crouthers and Armstrong are entitled to qualified official immunity as to Degolia's state-law claims. Thus, Counts III–V against Armstrong and Crouthers will be dismissed with prejudice.

But because Branstutter violated a clearly established constitutional right, a jury could conclude he acted in bad faith. Therefore, Branstutter is not entitled to qualified official immunity.

### B.    Negligence (Count III)

The general elements of negligence are: (1) duty; (2) breach; (3) injury; and (4) legal causation between the defendant's breach and the plaintiff's injury. *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012). Branstutter plainly owed Degolia a duty "to keep him safe and to protect him from unnecessary harm," *Hall v. Midwest Bottled Gas Distrib., Inc.*, 532 S.W.2d 449, 452 (Ky. Ct. App. 1976), as well as a duty "to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody." *Ratliff v. Stanley*, 7 S.W.2d 230, 232 (Ky. Ct. App. 1928). Whether Branstutter breached that duty is a question for the jury.

Accordingly, Count III against Branstutter stands.

### C.    Assault & Battery (Count IV)

Under Kentucky law, "a guard or other person authorized to act as a peace officer is justified in using any force, including deadly force, which he believes to be necessary to prevent the escape of a person from jail, prison, or other institution for the detention of persons charged with or convicted of a crime." KRS § 503.090(3). In

relevant part, KRS § 503.110 further provides that:

> The use of physical force by a defendant upon another person is justifiable when the defendant is a warden or other authorized official of a correctional institution, and:
>
> (a) The defendant believes that the force used is necessary for the purpose of enforcing the lawful rules of the institution; [and]
>
> (b) The degree of force used is not forbidden by any statute governing the administration of the institution . . .

KRS § 503.110(2).

Because this section turns on Branstutter's subjective belief, it is an issue for the jury. *Woodcock*, 679 F. App'x at 426 (applying Kentucky law); *Anderson*, 477 U.S. at 255 ("Credibility determinations, . . . and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). Accordingly, Count IV against Branstutter survives.

### D.    Intentional Infliction of Emotional Distress (Count V)

Count V must be dismissed as to all Defendants. The Kentucky Supreme Court was emphatically clear that:

> [W]here an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie.

*Childers v. Geile*, 367 S.W.3d 576, 582 (Ky. 2012) (alteration in original) (quoting *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993)); *Lea v. U.S. Dep't of Agriculture*, Nos. 13-5969/6191, 2014 U.S. App. LEXIS 24835, at *9 (6th Cir.

2014). In other words, "if a set of facts establishes a traditional tort, by definition it *cannot* establish intentional infliction of emotional distress." *Childers*, 367 S.W.3d at 584 (emphasis in original).

Because the facts here are clearly based on conduct amounting to assault and battery, Count V must be dismissed with prejudice as to all Defendants.

### E. Respondeat Superior (Count VI) – State-Law Claims Against the County and State-Law Official Capacity Claims

In Count VI, Degolia alleges the County and the named subdivisions are vicariously liable for the acts of the individual Defendants because the County employed these deputies. (Doc. 1, ¶ 59).[25] Although Degolia's claims for negligence and assault and battery against Branstutter have survived summary judgment, these claims cannot lie against the County, Kenton County Fiscal Court, or Kenton County Detention Center.

Kentucky law provides that "[s]overeign immunity bars state-law actions against [Kentucky] county governments." *Doe v. Magoffin Cty. Fiscal Court*, 174 F. App'x. 962, 971 (6th Cir. 2006). Absent a legislative waiver of immunity, Kentucky counties cannot be held "vicariously liable in a judicial court for the ministerial acts of its agents, servants, and employees." *Schwindel v. Meade Cty.*, 113 S.W.3d 159, 163 (Ky. 2003)).

---

[25] The doctrine of "*respondeat superior* is not a cause of action. It is a basis for holding the [Defendant] responsible for the acts of its agents." *O'Bryan v. Holy See*, 556 F.3d 361, 370 n.1, 383 (6th Cir. 2009).

Degolia has not pointed to any authority establishing that sovereign immunity for Kenton County has been waived. Moreover, "Kentucky courts have treated fiscal courts as county governments and thus have permitted fiscal courts to share sovereign immunity with county governments." *Id.* The "Kenton County Detention Center is merely an operational endeavor of the Kenton County Fiscal Court which, in turn, is part of Kenton County." *Robinson v. Kenton Cty. Det. Ctr.*, No. 2011-CA-001095-MR, 2013 WL 560699, at *2 (Ky. Ct. App. Feb. 15, 2013); (Doc. 1, ¶¶ 4–5). And a "jailer," sued "in his official capacity," is cloaked "with the county's sovereign immunity." *Commonwealth Bd. of Claims v. Harris*, 59 S.W.3d 896, 899 (Ky. 2001).

Therefore, state-law sovereign immunity bars Degolia's state-law claims (Counts III–V) against the County, Kenton County Fiscal Court, the Kenton County Detention Center, and the individual Defendants in their official capacities.

## V.   CONCLUSION

Consistent with the accompanying Memorandum Opinion, it is hereby **ORDERED** that:

(1) Plaintiff's motion for leave to file an affidavit as a surreply to the motion to strike (Doc. 74), is **GRANTED**;

(2) Plaintiff's motion to extend the deadline to file a dispositive motion (Doc. 67), is **GRANTED**;

(3) Defendants' motion to strike plaintiff's cross-motion for summary judgment

(Doc. 64), is **DENIED;**

(4) Plaintiff's amended complaint (Doc. 78), is **STRICKEN** from the docket;

(5) Defendants' joint motion for summary judgment on all claims (Doc. 61), is

    **DENIED IN PART and GRANTED IN PART;**

(6) Defendant's motion for summary judgment is **DENIED** as to Counts I, III,

    and VI against Defendant Aaron Branstutter;

(7) All claims against Defendants Michael Crouthers and Amanda Armstrong

    are **DISMISSED WITH PREJUDICE;**

(8) Counts II, V, and VI against Defendant Aaron Branstutter are **DISMISSED**

    **WITH PREJUDICE;**

(9) All claims against Kenton County, Kenton County Fiscal Court, the Kenton

    County Detention Center, and the individual Defendants in their official

    capacities are **DISMISSED WITH PREJUDICE;**

(10)   Plaintiff's cross-motion for summary judgment on the issues of qualified

    immunity and the use of excessive force (Doc. 63), is **GRANTED IN PART**

    **and DENIED IN PART;**

(11) On the issue of liability under Count I against Defendant Aaron

    Branstutter, insofar as it concerns his conduct in the booking room,

    summary judgment in favor of plaintiff is **GRANTED;**

(12) A final pretrial conference be, and is hereby, **SET FOR FRIDAY, JULY**

    **12, AT 1:00 P.M**. A copy of the Court's standard final pretrial order shall

enter concurrently herewith;

(13) A jury trial on all remaining claims be, and is hereby, **SET FOR MONDAY, AUGUST 12, 2019, BEGINNING AT 10:00 A.M.** Each side shall have ten (10) hours to present their case.

A separate judgment shall enter concurrently herewith.

This 7th day of May 2019.



**Signed By:**

**_William O. Bertelsman_** _WOB_

**United States District Judge**